UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| **Hayam EL GAMAL, Habiba SOLIMAN, E.S., A.S., H.S.,** and **O.S.**,<br><br>*Petitioners-Plaintiffs*,<br><br>v.<br><br>**Kristi Noem**, in her official capacity as Secretary of the Department of Homeland Security; **Pamela BONDI**, in her official capacity as U.S. Attorney General; **Todd LYONS**, in his official capacity as Acting Director of Immigration and Customs Enforcement; Sylvester **ORTEGA**, in his official capacity as Acting Director of ICE San Antonio Field Office and **Jose RODRIGUEZ, Jr.**, in his official capacity as Administrator of Dilley Immigration Processing Center,<br><br>*Respondents-Defendants*. | Case No. 1:25-cv-01618 |

**VERIFIED PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

### INTRODUCTION

1. Petitioners-Plaintiffs, Hayam El Gamal ("Ms. El Gamal") and her five children (collectively "Petitioners")—Habiba Soliman, E.S., A.S., H.S., and O.S.—have been confined by Immigration and Customs Enforcement ("ICE") at Dilley Immigration Processing Center, hundreds of miles from their home in Colorado, since June 4, 2025. They are citizens of Egypt who entered the United States lawfully with B-1 visitor visas in 2022 and have resided in the country ever since.

1

2. An Immigration Judge ("IJ") granted Petitioners bond on September 19, 2025, after determining that they were not subject to mandatory detention and posed neither a danger to the community nor a flight risk. Less than an hour later, the Department of Homeland Security ("DHS") filed a "notice of intent to appeal" pursuant to 8 C.F.R. § 1003.19(i)(2), which had the effect of automatically staying the IJ's decision along with the Petitioners' release from detention. DHS filed the automatic stay despite having previously conceded that Petitioners pose no danger to the community, in a stark departure from prior agency practice.

3. Ms. El Gamal and her children now respectfully request this court issue a writ of habeas corpus directing Respondents to release them pursuant to the terms of the IJ's bond order because their continued confinement violates their constitutional rights to procedural and substantive due process.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 2241, and Article I, § 9, cl. 2 of the United States Constitution (the Suspension Clause). The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 2241 because Ms. El Gamal and her children are detained at Dilley Immigration Processing Center in Dilley, Texas, within the Western District of Texas.

## PARTIES

6. Petitioner-Plaintiff **Hayam El Gamal** is a 42-year-old woman born in Saudi Arabia and lawfully admitted to the United States in 2022. Until her arrest and confinement by ICE, she

had been living in Colorado Springs, Colorado. She has been confined at Dilley Immigration Processing Center in Dilley, Texas, since June 4, 2025.

7. Petitioner-Plaintiff **Habiba Soliman** is Ms. El Gamal's 18-year-old daughter. She is confined at Dilley Immigration Processing Center in Dilley, Texas.

8. Petitioner-Plaintiff **E.S.** is Ms. El Gamal's four-year-old daughter. She is confined at Dilley Immigration Processing Center in Dilley, Texas.

9. Petitioner-Plaintiff **A.S.** is Ms. El Gamal's four-year-old son. He is confined at Dilley Immigration Processing Center in Dilley, Texas.

10. Petitioner-Plaintiff **H.S.** is Ms. El Gamal's nine-year-old daughter. She is confined at Dilley Immigration Processing Center in Dilley, Texas.

11. Petitioner-Plaintiff **O.S.** is Ms. El Gamal's 16-year-old son. He is confined at Dilley Immigration Processing Center in Dilley, Texas.

12. Respondent-Defendant **Kristi Noem** is named in her official capacity as Secretary of DHS. In this capacity, she is responsible for the administration of the immigration laws, including any effort to confine and remove Petitioners. As such, she is a custodian of Ms. El Gamal and her children.

13. Respondent-Defendant **Pamela Bondi** is named in her official capacity as Attorney General. In this capacity, she is responsible for the administration of the immigration laws and is a custodian of Ms. El Gamal and her children.

14. Respondent-Defendant **Todd Lyons** is named in his official capacity as Acting Director of ICE. In this capacity, he is responsible for the enforcement of the immigration laws, including provisions concerning civil immigration confinement. As such, he is a custodian of Ms. El Gamal and her children.

15. Respondent **Sylvester Ortega** is named in his official capacity as Acting Director of the ICE Enforcement and Removal Operations ("ERO") Field Office in San Antonio, Texas. In this capacity, he is responsible for the enforcement of U.S. immigration law, including provisions concerning civil immigration confinement, in Central Texas. As such, he is a custodian of Ms. El Gamal and her children.

16. Respondent **Jose Rodriguez, Jr.** is named in his official capacity as Administrator of Dilley Immigration Processing Center. In this capacity, he oversees the daily administration of the detention center at which Ms. El Gamal and her children are confined. As such, he is the immediate custodian of Ms. El Gamal and her children.

## STATEMENT OF FACTS

### I. Background

17. Ms. El Gamal and her children were arrested on June 3, 2025, in retribution for their husband/father Mohamed Soliman's alleged attack on a peaceful gathering of individuals commemorating Israeli hostages in Boulder, Colorado, on June 1, 2025. The official White House X (formerly Twitter) account posted on June 3, 2025, at 3:12 p.m. Central Time: "JUST IN: The wife and five children of illegal alien Mohamed Soliman—the suspect in the antisemitic firebombing of Jewish Americans—have been captured and are now in ICE custody for expedited removal. THEY COULD BE DEPORTED AS EARLY AS TONIGHT."[1] Thirty minutes later, at 3:42 p.m. Central Time, the same account posted an update with the text, "Six One-Way Tickets for Mohamed's Wife and Five Kids. Final Boarding Call Coming Soon."[2]

---

[1] @WhiteHouse, X (June 3, 2025, 3:12 p.m. CT), https://x.com/WhiteHouse/status/1929994561398681868
[2] @WhiteHouse, X (June 3, 2025, 3:42 p.m. CT), https://x.com/WhiteHouse/status/1930002225860133080?t=ryvUEn5J2xTnSisLHpmgLw&s=09

4

18. Ms. El Gamal and her five children have fought to regain their liberty through every legal avenue available to them, including by seeking habeas relief and custody redetermination before an IJ.

19. A petition for writ of habeas corpus was filed on Ms. El Gamal and her children's behalf in the United States District Court for the District of Colorado. This petition was ultimately transferred to the Western District of Texas because the family had been moved out of Colorado minutes before it was filed. *Dvortsin v. Noem*, Case No. 25-cv-01741 (D. Colo. June 12, 2025), Dkt. 16. The District Court for the Western District of Texas later dismissed the petition without prejudice on jurisdictional grounds. *Dvortsin v. Noem*, Case No. 25-cv-00664 (W.D. Tex. July 2, 2025) Dkt. 29.

## II. Petitioners' Attempt to Regain Their Liberty and Defend Themselves Against Removal

20. Consistent with their legal obligations to assess dangerousness and flight risk on an individualized and non-discriminatory basis, Respondents should have released Ms. El Gamal and her children on their own recognizance or subject to reasonable conditions pursuant to 8 U.S.C. § 1226(a). Instead, Respondents have confined them hundreds of miles from their friends and community and stymied every administrative avenue pursued for their release. Since being served with Notices to Appear ("NTA") in June 2025, Ms. El Gamal and her children have utilized every legal tool available to regain their liberty and defend themselves against removal.

*A. Custody Proceedings*

21. Ms. El Gamal and her children promptly exercised their right to seek a bond determination. In order to grant release on bond, an IJ must determine that an individual is neither a danger to the community nor a flight risk. *Matter of Guerra*, 24 I. & N. Dec. 37, 40 (BIA 2006). Neither the IJ nor the Board of Immigration Appeals ("BIA") on appeal has jurisdiction to assess

the constitutionality of Petitioners' confinement or of the statutes and regulations governing it. Thus, a federal court sitting in habeas jurisdiction is the only forum in which Ms. El Gamal and her children can meaningfully challenge the constitutionality of their confinement pending their ongoing removal proceedings.

22. In support of their request for release on bond, Petitioners submitted copious evidence of their lack of knowledge or involvement in the violent attack by Mohamed Soliman, the Petitioners' husband and father, including a transcript of sworn testimony by the lead FBI Special Agent in Charge ("SAC") on Mr. Soliman's case. In addition, Ms. El Gamal submitted numerous letters of support from U.S. citizen friends and family members showing the extensive community ties they have built in Colorado Spring. Petitioners also submitted extensive evidence provided by a community sponsor as to their ability to house the family in a safe and comfortable setting, with ample community support. *See* Exh. A at 6.

23. As the September 12, 2025 custody hearing before an IJ, DHS conceded that no Petitioner is a danger to the community but argued that Ms. El Gamal and Ms. Soliman were flight risks.

24. In support of this argument, DHS relied on two claims: (1) that the family's asylum claims lack merit, and (2) that the apartment in which their sponsors have committed to house them is "not a habitable" space. DHS' brief containing these points is referenced in the IJ's order. *See* Exh. A at 5-6. Petitioner rebutted those assertions, noting that at least one of their claims is squarely on point with legal precedent which has been in place since 1996. *See, e.g., Matter of Kasinga,* 21 I&N 357 (BIA 1996). As to the location where the family would be housed, Petitioners submitted extensive evidence that the 1400 square foot dwelling had multiple bedrooms, two bathrooms, multiple living areas, a full kitchen and a kitchenette. Far from being

the constitutionality of Petitioners' confinement or of the statutes and regulations governing it. Thus, a federal court sitting in habeas jurisdiction is the only forum in which Ms. El Gamal and her children can meaningfully challenge the constitutionality of their confinement pending their ongoing removal proceedings.

22. In support of their request for release on bond, Petitioners submitted copious evidence of their lack of knowledge or involvement in the violent attack by Mohamed Soliman, the Petitioners' husband and father, including a transcript of sworn testimony by the lead FBI Special Agent in Charge ("SAC") on Mr. Soliman's case. In addition, Ms. El Gamal submitted numerous letters of support from U.S. citizen friends and family members showing the extensive community ties they have built in Colorado Spring. Petitioners also submitted extensive evidence provided by a community sponsor as to their ability to house the family in a safe and comfortable setting, with ample community support. *See* Exh. A at 6.

23. As the September 12, 2025 custody hearing before an IJ, DHS conceded that no Petitioner is a danger to the community but argued that Ms. El Gamal and Ms. Soliman were flight risks.

24. In support of this argument, DHS relied on two claims: (1) that the family's asylum claims lack merit, and (2) that the apartment in which their sponsors have committed to house them is "not a habitable" space. DHS' brief containing these points is referenced in the IJ's order. *See* Exh. A at 5-6. Petitioner rebutted those assertions, noting that at least one of their claims is squarely on point with legal precedent which has been in place since 1996. *See, e.g., Matter of Kasinga,* 21 I&N 357 (BIA 1996). As to the location where the family would be housed, Petitioners submitted extensive evidence that the 1400 square foot dwelling had multiple bedrooms, two bathrooms, multiple living areas, a full kitchen and a kitchenette. Far from being

inhabitable, the proposed living arrangement was larger than the town home where they were living when they were detained.

25. At the same hearing, DHS asserted that Ms. El Gamal and Ms. Soliman were nonetheless subject to mandatory detention because they were, respectively, the wife and child of a person inadmissible for having engaged in terrorist activity. *See* 8 U.S.C. § 1182(a)(3)(B)(i)(I), (IX); *see also* §1182(a)(3)(B)(iii). Following extensive testimony and review of the evidence, DHS conceded that Ms. Soliman was not subject to the restriction, but nonetheless asserted that Ms. El Gamal was subject to mandatory detention. When pressed by the IJ to explain why, DHS could only speculate that her physical "proximity" to Mr. Soliman meant that she must have known about his plans.

26. On September 19, 2025, after taking evidence and reviewing DHS' brief, the IJ issued a written decision granting bond. *Id.* at 6.

27. The IJ determined that Petitioners are not subject to mandatory detention because (despite the family relationship to Mr. Soliman) one or both of the exceptions to 8 U.S.C. § 1182(a)(3)(B)(i)(IX)—"spouse or child of a[ non-citizen] who is inadmissible" on grounds of terrorist activity—applied to Petitioners. *Id.* at 2.

28. The exceptions apply to spouses and children who "did not know or should not reasonably have known of the activity causing the [non-citizen] to be found inadmissible under this section" and those whom DHS "has reasonable grounds to believe ha[ve] renounced the activity causing the [non-citizen] to be found inadmissible under this section. 8 U.S.C. § 1182(a)(3)(B)(i)(IX)(I)-(II).

29. The IJ noted that "the husband/father is not a party to [Petitioners'] removal or bond cases" and held that "the information and evidence in the bond record supports a finding that the

[Petitioners] did not know or should not reasonably have known of the husband/father's terrorist activity." Exh. A at 3.

30. In support of this conclusion, the IJ noted several facts in the record:

- "According to FBI Special Agent Chan's testimony at a federal preliminary hearing on June 18, 2025, he confirmed that law enforcement spoke with the family very shortly after the incident and [Ms. El Gamal] and [Ms. Soliman] reported that what was described was 'totally out of character.'" *Id.*

- Special Agent Chan reported that Ms. El Gamal and Ms. Soliman "had no inkling at all that [Mr. Soliman] was planning to do this or even think about doing anything like this." *Id.*

- Several news articles submitted by DHS were consistent with information on the record that "would appear consistent with Special Agent Chan's testimony as noted above, specifically, that the family was unaware of the husband/spouse's [sic] activities." *Id.*

- DHS Secretary Noem had previously promised to bring charges against the family if their involvement was factually supported, but no such charges have been brought. "DHS has not pointed to any evidence gleaned from the investigation that has purportedly been underway for over three months." *Id.* at 4.

31. The IJ also found that Ms. El Gamal and Ms. Soleiman qualify under the second prong of the exception because Petitioners had renounced the attack. The family cooperated with authorities consistently and "in addition to cooperating with law enforcement, shortly after the husband/father's attack on the demonstrators, the [Petitioners], through their attorney, posted a statement on social media indicating the family's shock over the incident and declaring that there is never an excuse for hurting innocent people. The statement also confirms that the family has

been cooperating with law enforcement officials, and condolences were expressed to the families who are suffering as a result of the attack." *Id.*

32. Having concluded that Petitioners were not subject to mandatory detention, the IJ went on to assess the standard bond factors. The government did not argue that Petitioners posed a danger to the community. *Id.* at 5. The IJ "note[d] that such a position would seem to belie the DHS argument that the [Petitioners] are subject to mandatory detention vis-à-vis 'terrorist activities' and their knowledge thereof." *Id.*

33. The IJ concluded that Petitioners did not pose a flight risk, noting that they "submitted evidence from sponsors who will provide them with support and lodging," and rejecting the government's arguments about the habitability of the apartment in which the family will live. *Id.* The IJ also held that Petitioners' "diligent efforts in filing for affirmative relief [asylum] undermine the notion that they would abscond when it comes to following through on their efforts to qualify for relief to remain in the United States legally. Given their prior efforts regarding affirmative relief, the circumstances demonstrate that the [Petitioners] are motivated and have incentive to appear at future hearings." *Id.* at 6.

34. The IJ further noted that Petitioners "have submitted numerous letters of support from their local community," "submitted several certifications reflecting [Ms. El Gamal's] continued education in the United States pertaining to information technology," "have no criminal record," and "have also continued to cooperate with law enforcement regarding the investigation into the husband/father's federal criminal case." *Id.*

35. As such, the IJ held that a $15,000 bond for the entire family "will help mitigate the flight risk and ensure that the [Petitioners] appear at all future hearings and abide by all immigration obligations." *Id.*

B.  *Automatic Stay*

36. By regulation, DHS may unilaterally prevent an IJ's bond order from going into effect whenever it believes a non-citizen "should not be released." 8 C.F.R. § 1003.19(i)(2). As a result, the non-citizen will necessarily remain in custody until either the BIA decides the bond appeal or ninety days pass. *Id* § 1003(c)(4).

37. Because DHS has ten business days to file the notice of appeal before the ninety-day clock begins, the regulatory stay provision creates a more than 100-day due-process-free period during which there is no ability to present an argument to a neutral arbiter. *Id.*

38. At the end of the automatic stay period, the IJ's order to release a non-citizen on bond remains stayed for up to thirty days while the BIA considers any discretionary stay request. *Id.* § 1003(c)(5). Thus, the regulations permit over a 130-day period of confinement without any procedures to contest or challenge that confinement.

39. Incredibly, and in a departure from prior agency practice, DHS exercised its automatic stay power in Petitioners' case, despite their lack of criminal history and the agency's own concession that they do not pose any danger to the community. *See* Exh. B. In effectuating the automatic stay, DHS was not required to make any showing whatsoever, and Petitioners did not have any opportunity to respond. DHS merely had to file a piece of paper to keep Ms. El Gamal and her children confined.

C.  *Removal Proceedings*

40. Since being served NTAs in June 2025, Ms. El Gamal and her children, represented by immigration counsel, have filed applications for humanitarian relief, including asylum, withholding of removal, and protection under the Convention Against Torture.

10

41. Notably, even if the IJ grants Ms. El Gamal and her children relief, DHS may keep them confined while it determines whether it will appear such order and during the pendency of any appeal. *See* 8 C.F.R. § 1003.6(a).

42. Thus, even if the IJ grants Petitioners protection against removal, or again orders their release on bond or other reasonable conditions, DHS may prevent their release while it pursues appeal by invoking another automatic stay of such an order.

## CLAIMS FOR RELIEF

### Count I: Fifth Amendment Procedural Due Process
*28 U.S.C. § 2241*

43. Petitioners incorporate by reference all preceding paragraphs as if fully set forth herein.

44. The automatic stay provision of 8 C.F.R. § 1003.19(i)(2) is facially unconstitutional. Alternatively, it is unconstitutional s applied to Ms. El Gamal and her children.

45. The provision authorizes a self-executing deprivation of physical liberty whenever DHS files a one-page form after an IJ orders release. It requires no showing by DHS, nor a neutral adjudication, before it takes effect, and it endures for months by design: up to 90 days after DHS' notice of appeal; additional time if the BIA is still deciding a discretionary stay motion; an additional five business days even if the BIA denies a stay; and up to fifteen more business days if the matter is referred to the Attorney General. 8 C.F.R. §§ 1003.19(i)(2); 1003.6(c)(1)-(5), (d). These features apply in every application of the provision.

46. When the government interferes with a liberty interest, "the procedures attendant upon that deprivation [must be] constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). The constitutional sufficiency of procedures is determined by weighing three factors: (1) the private interest that will be affected by the official action, (2) the risk of erroneous

deprivation of that interest through the available procedures, and (3) the government's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

47. Across its full sweep, the provision denies "the opportunity to be heard at a meaningful time and in meaningful manner," because it postpones any neutral determination about continued detention until long after a release order, and makes that postponement turn solely on DHS' unilateral filing. *See Mathews*, 424 U.S. at 333.

48. The provision systematically flips an IJ's liberty finding—entered after an adversarial hearing at which the non-citizen bears the burden of establishing eligibility for release—without any countervailing, case-specific showing by the government. That design maximizes the risk of erroneous deprivation of a core liberty interest while adding no meaningful procedural guardrails. *See Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

49. The government's interest in preventing mistaken release is fully protected by existing discretionary stay tools that require adjudicative balancing (rather than a prosecutor's switch). The BIA can grant a stay case-by-case, and the Attorney General can do likewise on certification. 8 C.F.R. § 1003.6(c)-(d). Those mechanisms track traditional equitable stay standards while the automatic stay provision dispenses with those safeguards by default.

50. Detention without a neutral, prompt determination is anathema to due process. Even in criminal settings, the Constitution requires neutral decisionmakers and robust procedures before continued confinement. *See Gerstein v. Pugh*, 420 U.S. 103, 114-16 (1975) (prompt, neutral probable-cause check); *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004) (neutral decisionmaker to contest detention). If those baselines are required there, they are certainly required in the context of a civil detention.

51. The automatic stay provision was found to be facially unconstitutional by the District Court for the Northern District of California in 2004. *Zavala v. Ridge*, 310 F. Supp. 2d 1071, 1077 (N.D. Cal. 2004). The District Court for the District of Nevada recently came to the same conclusion. *Herrera v. Knight*, No. 2:25-cv-01366, 2025 WL 2581792, at *12 (D. Nev. Sept. 5, 2025) ("Detention pursuant to the automatic stay after the government already failed to establish a justification for it, with no process afforded to challenge the detention as arbitrary, is facially violative of procedural due process.").

52. Because the automatic stay provision categorically authorizes detention based purely on DHS' unilateral filing and postpones neutral review for extended periods of time, it is facially unconstitutional under the Fifth Amendment. As such, the Court should declare the provision invalid.

53. Even if the automatic stay provision is not facially unconstitutional, it is unconstitutional as applied to Petitioners.

54. Petitioners have a weighty liberty interest because their freedom "from government . . . detention . . . lies at the heart of the liberty that [the Fifth Amendment] protects." *Zadvydas*, 533 U.S. at 693.

55. The risk of erroneous deprivation of Petitioners' liberty is extremely high given that the government has already used the automatic stay provision to unilaterally override the IJ's bond determination without any procedural protections at all. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333 (quotation omitted), yet the government's use of the automatic stay provision is not subject to review by an impartial adjudicator. Indeed, Petitioners cannot contest it at all.

56. Finally, the government's interest in preserving its unilateral authority to prevent Petitioners' release, after they have shown they are not a flight risk and the government itself has conceded that they are not a danger to the community, is minimal. Providing additional procedural protections here introduces no additional administrative burdens because the regulations *already* provide the government with the opportunity to seek a discretionary or emergency stay of a bond decision.

57. Other habeas courts have recently found application of the automatic stay provision to facts similar to those presented here likely to violate the Fifth Amendment. *See, e.g.*, *Alvarez Martinez v. Noem*, No. 25-cv-01007, 2025 WL 2598379 (W.D. TX September 8, 2025); *Maldonado v. Olson*, No. 25-cv-3142, 2025 WL 2374411, at *13-16 (D. Minn. Aug. 15, 2025); *Anicasio v. Kramer*, No. 4:25-cv-3158, 2025 WL 2374224, at *3-5 (D. Neb. Aug. 14, 2025); *Mohamed H. v. Trump*, 786 F. Supp. 3d 1149, 1158 (D. Minn. 2025).

58. Because Respondents' invocation of the automatic stay provision violates Petitioner's Fifth Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Petitioners to safeguard their constitutional liberties.

### Count II: Fifth Amendment Substantive Due Process
*28 U.S.C. § 2241*

59. Petitioners incorporate by reference all preceding paragraphs as if fully set forth herein.

60. The Due Process Clause of the Fifth Amendment provides that no person shall be deprived of liberty without due process of law. U.S. Const. amend. V.

61. The "Due Process Clause applies to all persons within the United States, including [non-citizens], whether their presence here is lawful, unlawful, temporary, or permanent."

*Zadvydas*, 533 U.S. at 690. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the hear of the liberty that Clause protects." *Id.* at 693.

62. Confinement for non-criminal purposes is allowed only "in narrow nonpunitive circumstances, where a special justification . . . outweighs the individual's constitutionally protected interest in avoiding physical restraint. *Id.* (internal quotations and citations omitted).

63. With respect to immigration confinement, the Supreme Court has recognized two special justifications: preventing danger to the community or flight from immigration enforcement. *See id.*

64. Respondents' confinement of Ms. El Gamal and her children is wholly unjustified with respect to either justification.

65. At their bond hearing, Ms. El Gamal and her children bore the burden of establishing "to the satisfaction of the Immigration Judge" that they are neither a flight risk nor a danger to the community. *Guerra*, 24 I. & N. Dec. at 38. Ms. El Gamal and her children did just that.

66. Respondents' continued confinement of Ms. El Gamal and her children therefore no longer bears a "reasonable relation" to any legitimate, nonpunitive government purpose. *Zadvydas*, 533 U.S. at 690. Indeed, as indicated by statements from the White House, the apparent basis for their continued confinement is the government's desire to punish them for the actions of their husband/father—a constitutionally impermissible purpose.

67. Because Respondents have custody over Petitioners in violation of their Fifth Amendment rights, the Court should issue a writ of habeas corpus directing Respondents to release Petitioners to safeguard their constitutional liberties.

### Count III: The Automatic Stay Regulation is *Ultra Vires*
*28 U.S.C. § 2241*

68. Petitioners incorporate by reference all preceding paragraphs as if fully set forth herein.

69. The regulatory automatic stay provision at 8 C.F.R. § 1003.19(i)(2) is *ultra vires* because it exceeds the statutory authority that is granted to the Attorney General.

70. Petitioners are detained pursuant to 8 U.S.C. § 1226(a). Pursuant to 28 U.S.C. § 510, the Attorney General has the authority to delegate detention determinations to "any other officer, employee, or agency of the Department of Justice." Immigration judges are within the Department of Justice and have been delegated bond-determination authority. 8 U.S.C. § 1101(b)(4). The Department of Homeland Security, the party that has invoked the automatic stay provision, is not a part of the Department of Justice. *See* 6 U.S.C. § 111.

71. DHS' ability pursuant to 8 C.F.R. § 1003.19(i)(2) to unilaterally stay a bond determination made by an IJ who holds the properly delegated authority to make such a determination exceeds the statutory authority Congress has given the Attorney General.

72. "Agency actions beyond delegated authority are 'ultra vires,' and courts must invalidate them." *Transohio Sav. Bank v. Director, Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992).

### PRAYER FOR RELIEF

WHEREFORE, Petitioners respectfully request that this Court grant the following relief:

A. Assume jurisdiction over this matter;

B. Issue an Order to Show Cause pursuant to 28 U.S.C. § 2243, directing Respondents to show cause why the petition for a writ of habeas corpus should not be granted within three days;

C. Declare that Respondents' confinement of Petitioners violates their Fifth Amendment substantive and procedural due process rights;

D. Declare that 8 C.F.R. § 1003.19(i)(2) is unconstitutional, *ultra vires*, and therefore invalid;

E. Issue a writ of habeas corpus requiring Respondents to release Petitioners upon receipt of payment of the $15,000 bond ordered by the Immigration Judge;

F. Enjoin Respondents from re-invoking the automatic stay against Petitioners in any future custody redetermination hearing;

G. Enjoin the BIA from granting a discretionary stay of any custody redetermination order absent a meaningful opportunity for Petitioners to oppose;

H. Prohibit the re-detention of Petitioners unless and until Respondents provide Petitioners' counsel and a U.S. District Court with jurisdiction over Petitioners notice of their intent to re-detain them and demonstrate by clear and convincing evidence at a hearing that the Court subsequently calendars that the re-detention of Petitioners is the least restrictive means of preventing danger to the community and/or addressing risk of flight from immigration enforcement;

I. Award Petitioners costs and reasonable attorneys' fees in this action pursuant to the Equal Access to Justice Act, as amended, 28 U.S.C. § 2412, and on any other basis justified by law; and

J. Grant any other and further relief that this Court may deem fit and proper.

Dated: October 6, 2025

*/s/Rebecca Webber*
Rebecca Webber
Tex. Bar No. 24060805
WEBBER LAW
4228 Threadgill St.
Austin, TX 78723
Tel: (512) 537-8833
Fax: (202) 333-6470
rebecca@rebweblaw.com

*/s/Niels Frenzen*
Niels Frenzen*
Cal. Bar No. 139064
USC GOULD SCHOOL OF LAW
IMMIGRATION CLINIC
699 Exposition Blvd.
Los Angeles, CA 90089
Tel: (213) 740-8933
Fax: (213) 740-5502
nfrenzen@law.usc.edu

Respectfully Submitted,

*/s/ Eric Lee*
Eric Lee*
Mich. Bar No. P80058
*/s/ Christopher Godshall-Bennett*
Christopher Godshall-Bennett*
D.C. Bar No. 1780920
LEE & GODSHALL-BENNETT LLP
Tel: (202) 949-2526
Fax: (202) 333-6470
eric@leegodshallbennett.com
chris@leegodshallbennett.com

**Pro Hac Vice* forthcoming*

18

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I am submitting this verification on behalf of Petitioners-Plaintiffs because I am one of Petitioners-Plaintiffs' attorneys. I have discussed with the Petitioners-Plaintiffs the events described in this Petition. Based on those discussions, I hereby verify that the factual statements in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Executed on this 6th day of October 2025.

*/s/ Eric Lee*
Eric Lee
Attorney for Petitioners-Plaintiffs