IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| HAYAM EL GAMAL, HABIBA SOLIMAN, E.S., A.S., H.S., O.S., <br><br> *Plaintiffs,* <br><br> vs. <br><br> KRISTI NOEM, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE DEPARTMENT OF HOMELAND SECURITY; PAMELA BONDI, IN HER OFFICIAL CAPACITY AS U.S. ATTORNEY GENERAL; TODD LYONS, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF IMMIGRATION AND CUSTOMS ENFORCEMENT; SYLVESTER ORTEGA, IN HIS OFFICIAL CAPACITY AS ACTING DIRECTOR OF ICE SAN ANTONIO FIELD OFFICE; AND JOSE RODRIGUEZ JR., IN HIS OFFICIAL CAPACITY AS ADMINISTRATOR OF DILLEY IMMIGRATION PROCESSING CENTER; <br><br> *Defendants.* | § § § § § § § § § § § § § § § § § § § § § § § § § § § | SA-25-CV-01261-FB |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the First Amended Verified Petition for Writ

of Habeas Corpus filed by Petitioners Hayam El Gamal and her five children, Habiba Soliman

(age 18), E.S. (age 16), A.S. (age 9), and H.S. and O.S. (twins, age 5) [#42].  Petitioners assert

two claims for relief in their Amended Petition: (1) the allocation of the burden of proof at their

recent custody redetermination hearing violated their right to procedural due process; and (2) the

1

separation of Habiba Soliman from her mother and siblings at the immigration facility where they are currently detained is unconstitutionally punitive.

All pretrial matters in this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C [#20].   The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, it is recommended that the Amended Petition be granted as to Petitioners' procedural-due-process claim and that Petitioners be released from custody.

## I.  Jurisdiction and Venue

The parties agree that Petitioners are currently being detained under 8 U.S.C. § 1226(a), which governs the discretionary detention of immigrant detainees pending a final order of removal.  The Real ID Act divests federal district courts of jurisdiction to consider challenges to removal orders.  8 U.S.C. § 1252(a)(5) (designating courts of appeals as the sole forums for such challenges via petitions for review); *Moreira v. Mukasey*, 509 F.3d 709, 712 (5th Cir. 2007). Federal courts also lack jurisdiction to review discretionary decisions of the Attorney General under Section 1226 "regarding the detention or release of any alien or the grant, revocation, or denial of bond or parole."  8 U.S.C. § 1226(e); *Zadvydas v. Davis*, 533 U.S. 678, 688 (2001).

These provisions do not preclude judicial review of the issues raised in the Amended Petition.   As to the challenge regarding the burden-of-proof allocation, Petitioners do not challenge any underlying order in their removal proceedings.  Nor do they challenge a specific decision to deny them bond.  Rather, they challenge the constitutionality of procedures employed at the custody hearing underlying a discretionary bond decision.

Generally speaking, federal courts have jurisdiction to adjudicate claims challenging the constitutionality of an alien's continued detention. *See Abdulle v. Gonzales*, 422 F. Supp. 2d 774, 776 (W.D. Tex. 2006) (citing *Gul v. Rozos*, 163 F. App'x 317, at *1 (5th Cir. 2006)). The Supreme Court has made clear that Section 1226(e) "does not preclude challenges to the statutory framework that permits the alien's detention without bail." *Jennings v. Rodriguez*, 583 U.S. 281, 295 (2018) (quotation omitted). That said, Section 1226(a) is silent as to the allocation of the burden of proof in custody proceedings. Therefore, this procedural component of custody hearings is not a "statutory framework," per se, and the decision to adopt procedures placing the burden of proof on noncitizens under Section 1226(a) (*see infra*) is in at least some sense discretionary. Yet the decision regarding burden allocation is not a constitutional challenge to a discretionary and individualized decision regarding "detention or release" but rather a constitutional challenge to a procedural aspect of detention proceedings. The jurisdiction-stripping provision of Section 1226(e) is therefore not implicated. *See Miranda v. Garland*, 34 F.4th 338, 352 (4th Cir. 2022) (construing statutory language of Section 1226(e) and rejecting government's argument that the provision deprives federal courts of jurisdiction to evaluate constitutionality of allocation of burden of proof in immigration detention proceedings). Nothing addressed in this opinion infringes on the discretion of the Attorney General to grant or deny bond in Petitioners' or any other individual case. *See Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005) ("Section 1226(e) may strip us of jurisdiction to review judgments designated as discretionary under the pertinent language of the statute, but it does not deprive us of all authority to review statutory and constitutional challenges.").

Venue is proper in this district pursuant to 28 U.S.C. §§ 1391 and 2241 because Petitioners are detained at an immigration detention center located in Dilley, Texas, within the Western District of Texas. *See Rumsfeld v. Padilla*, 542 U.S. 426, 442–43 (2004).

## II.  Background

Petitioner Hayam El Gamal is a native of Saudi Arabia; she, along with her five children, are citizens of Egypt.  Petitioners lawfully entered the United States in 2022, overstayed their visas, and were taken into custody on June 3, 2025, in alleged retribution for the terrorist activity of their husband/father, Mohamed Soliman.  Mr. Soliman is accused of throwing Molotov cocktails at demonstrators attending a march in support of Israeli hostages in Boulder, Colorado, on June 1, 2025, resulting in twelve people being injured.  (IJ Order [#42-1], at 3.)  After they were taken into custody, Petitioners were detained by Immigration and Customs Enforcement ("ICE") and placed in removal proceedings.

Petitioners exercised their right to seek a bond determination and appeared for a bond hearing on September 12, 2025.  (*Id.* at 4.)  The immigration judge ("IJ") issued a decision on September 19, 2025, granting Petitioners' release from ICE custody upon payment of a $15,000 bond.  (*Id.* at 2.)  At the bond hearing, the Department of Homeland Security ("DHS") argued that Ms. El Gamal and her 18-year-old daughter, Ms. Soliman, were subject to mandatory detention because they were the wife and adult child of a person inadmissible for having engaged in terrorist activity pursuant to 8 U.S.C. § 1182(a)(3)(B).  (*Id.* at 3.)  The IJ rejected this argument and determined Ms. El Gamal and Ms. Soliman were not subject to mandatory detention because they fell under at least one exception to 8 U.S.C. § 1182(a)(3)(B), as they submitted evidence of their lack of knowledge of or involvement in the attack by Mr. Soliman;

4

they cooperated with law enforcement; and they had renounced Mr. Soliman's conduct.  (*Id.* at 4–6.)

The IJ then considered whether Petitioners should nonetheless be detained due to being a danger to the community or a flight risk such that no bond amount would ensure their appearance at future hearings.  (*Id.* at 6.)  DHS conceded the Petitioners were not a danger to the community but argued Petitioners were a flight risk due to the weakness of their asylum claim and based on DHS's concern that the apartment in which Petitioners were to live was not "habitable" and that their community sponsors were not "valid, reliable, and credible."  (*Id.*)  Petitioners effectively rebutted those assertions with letters and financial documents from the joint sponsors indicating their willingness and ability to sponsor Petitioners, evidencing that Petitioners would have a fixed address in the U.S. upon release.  (*Id.* at 6–7.)  The IJ found that a $15,000 bond was sufficient to mitigate any flight risk and to ensure Petitioners appear at all future hearings.  (*Id.* at 7.)

That same day, ICE filed a Notice of Intent to Appeal Custody Redetermination and invoked an automatic stay of the IJ's bond order with the Board of Immigration Appeals ("BIA") under 8 C.F.R. § 1003.19(i)(2).  (Notice of Appeal [#42-2], at 2–7.)  ICE filed its Notice of Appeal with the BIA on October 2, 2025, arguing that the exceptions from mandatory detention identified by the IJ did not apply to Ms. El Gamal and that she remains a flight risk and should not be released on bond.

On October 6, 2025, Ms. El Gamal and Ms. Soliman filed their Petition for habeas relief in this Court on behalf of themselves and the four minor children, along with a motion for a temporary restraining order ("TRO"), challenging the constitutionality of the automatic stay provision of 8 C.F.R. § 1003.19(i)(2) and their continued detention.  While the TRO motion was

pending, DHS pursued an alternative basis for a stay of the IJ's bond decision by filing a motion for an emergency discretionary stay of the order from the BIA under 8 C.F.R. § 1003.19(i)(1). (TRO Order [#15], at 3.)

On November 18, 2025, the District Court granted Petitioner's motion for a TRO, finding that Petitioners were likely to succeed on the merits of their Petition as to the unconstitutionality of the automatic stay; vacated the automatic stay of the IJ's bond decision as unconstitutional; and ordered Petitioners' release from custody upon payment of the $15,000 bond. (*Id.* at 11.) However, the District Court stayed its order vacating the automatic stay and ordering Petitioners' release for a period of 14 days while the BIA considered the Government's request for a discretionary stay. (*Id.*) The District Court further ordered that, if no emergency stay was obtained by December 2, 2025, the automatic stay would be dissolved, and Petitioners would be permitted to post bond and be released in accordance with the IJ's bond determination order. (*Id.*) The District Court also ordered weekly status reports from the parties and referred the case to the undersigned for all future proceedings. (*Id.*) The undersigned ordered a response to the Petition from Respondents, and the parties subsequently sought several joint motions for extensions.

The first status report informed the Court that the BIA had granted DHS's motion for an emergency discretionary stay before the District Court issued its TRO on November 6, 2025. (BIA Stay Order [#16-1], at 2.) On November 28, 2025, the BIA remanded Petitioners' case for further bond proceedings on the applicability of the exceptions to mandatory detention, which resulted in the dissolution of the discretionary stay, the previous IJ's bond decision being vacated, and the TRO expiring. (Status Report [#22], at 1–3; BIA Remand Order [#34-1], at 1–7.)

An IJ held a merits hearing in Petitioners' primary removal proceedings on December 29, 2025,[1] and the IJ pretermitted their asylum applications without reviewing the merits on the basis that Petitioners had "abandoned" the applications and ordered Petitioners removed.  (Status Report [#27], at 1; Status Report [#29], at 1; IJ Order [#36-2], at 1–5.)  Petitioners filed a notice of appeal with the BIA on January 2, 2026.  (Status Report [#27], at 1.)  The appeal remains pending.  According to the latest status report from the parties, briefing was due to the BIA no later than April 6, 2026, but Petitioners have filed a request for a 21-day extension.  (Joint Status Report [#55], at 1–2.)

Regarding the remanded bond proceedings, the same IJ from the original bond hearing conducted three hearings, concluding on January 21, 2026.  (Status Report [#24], at 1; IJ Order [#42-3], at 2–8.)  Despite relying on the same evidentiary record upon which the IJ previously found Petitioners *not* to be a flight risk, the IJ denied bond.  (IJ Order [#42-3], at 2–8.)  The IJ again found that Petitioners were not subject to the terrorism-related ground of inadmissibility, but that Ms. El Gamal posed a significant flight risk and that no bond amount would ensure her appearance at future hearings.  (*Id.* at 3.)  The IJ's brief written opinion on this issue stated that he based his decision on (1) Ms. Gamal's lack of property and assets in the United States; (2) her lack of family ties in the United States; (3) her length of time in the United States; (4) and the denial of her application for asylum and withholding of protection.  (*Id.*)  The IJ applied the same reasoning to each of Ms. El Gamal's children to determine that each child, independently, poses a significant flight risk such that no bond amount would ensure their appearance at future hearings either.  (*Id.*)  Petitioners did not appeal the unfavorable custody determination but are

---

[1] The Immigration Clinic at Texas A&M University School of Law agreed to represent Petitioners in their removal proceedings but could not begin work until school resumed in January; the IJ would not agree to a continuance, and Petitioners were required to represent themselves *pro se* in those proceedings.  (Status Report [#26], at 1.)

preparing to submit new, material evidence[2] relating to the family's bond eligibility to the Immigration Court. (Joint Status Report [#53], at 1.)

Respondents filed their response to the Petition on January 26, 2026 [#34], arguing that this case is moot because the IJ determined that Petitioners are a flight risk and denied bond, meaning any procedural-due-process argument related to the automatic-stay provision is no longer a live controversy. In their reply [#36], Petitioners disputed mootness, argued there are several live claims at issue, and asked for leave to file an amended petition. The undersigned held an attorney-only status conference on February 6, 2026, to address the possibility of amendment. After the conference, the undersigned ordered Petitioners to file an amended petition and set a new briefing schedule [#39].

Petitioners filed their First Amended Verified Petition for Writ of Habeas Corpus on February 17, 2026 [#42], asserting two claims for relief. The first claim alleges a violation of procedural due process based on the IJ's allocation of the burden of proof on Petitioners to show a lack of danger to the community and a lack of flight risk at the recent custody redetermination hearings. The second claim alleges that Respondents have unconstitutionally separated Ms. Soliman (age 18) from her mother and siblings as punishment for her speaking to the media about her detention and the conditions at the Dilley facility. Respondents have filed a response to the Amended Petition [#46], to which Petitioners filed a Reply [#50]. The Amended Petition is ripe for the Court's review.

---

[2] A detainee may request a subsequent bond determination upon a "showing that the alien's circumstances have changed materially since the prior bond redetermination." 8 C.F.R. 1003.19(e)). Although Petitioners' status report does not explain the specific material changes they intend to raise in their request, the record in this case suggests that there have been numerous developments since Petitioners' custody redetermination hearings, which include the allegedly punitive separation of Ms. Soliman, Ms. El Gamal's hospitalization for medical issues, and the discovery of Government intimidation of Petitioners' family and community members in Colorado who could provide support were they to be released on bond. *See infra.*

**III.  Analysis**

Again, Petitioners raise two claims in their Amended Habeas Petition: (1) a violation of their right to procedural due process based on the allocation of the burden of proof at their custody redetermination hearings; and (2) a violation of their right to due process based on the punitive nature of the separation of Ms. Soliman from her mother and siblings while in detention. In this case, the Government's aggressive tactics taken to prevent Petitioners' release on bond combined with the allocation of the burden of proof on Petitioners to prove they are not a flight risk together violated Petitioners' right to procedural due process and, due to the unique circumstances of their case, they are entitled to release.  Because the undersigned is recommending that the Amended Petition be granted as to the first due-process claim, the undersigned has not and the District Court need not address Petitioners' second claim regarding the alleged punitive separation of Ms. Soliman from her family.

**A.     Petitioners are being detained under Section 1226(a)'s discretionary framework.**

Before turning to the merits of Petitioners' procedural-due-process claim, a brief explanation of the statutory framework governing custody determinations is warranted.  The Immigration and Nationality Act ("INA") provides that the Government may detain noncitizens who are awaiting a decision on whether they are to be removed from the United States.  8 U.S.C. § 1226(a).  Congress determined that detention during removal proceedings is mandatory for noncitizens who have committed certain types of criminal offenses.  *Id.* § 1226(c).  Section 1226(c) mandates detention of those who are "inadmissible" under Section 1182(a)(3)(B), which includes "the spouse or child of an alien who is inadmissible" for engaging in a terrorist activity. Although the Government attempted to secure Petitioners' mandatory detention under Section 1226(c), the Immigration Court rejected this argument based on the evidence presented of

Petitioners' lack of involvement and knowledge of the terrorism offense, meaning Petitioners fell under an exception to Section 1182(a)(3)(B) and were not subject to mandatory detention under Section 1226(c).  The Government does not claim that Petitioners have committed any other offense delineated in Section 1226(c).  Therefore, the discretionary-detention provision, Section 1226(a), controls this case.[3]  Under that subsection of the INA, the government "may release" a detained noncitizen on "bond . . . or conditional parole" pending a final decision on removal.  *Id.* § 1226(a).

An ICE officer makes the initial detention determination for noncitizens subject to detention under Section 1226(a).  *See* 8 C.F.R. § 236.1(c)(8).  If the officer opts for continued detention, the detainee can seek review of that decision at a bond hearing before an IJ.  *Id.* § 236.1(d)(1).  An IJ's decision to continue detaining a noncitizen may be further appealed to the BIA.  *Id.* § 236.1(d)(3).

Section 1226(a) is silent as to what burden of proof applies in bond hearings and who bears that burden.  *See* 8 U.S.C. § 1226(a).  "For many decades, the BIA interpreted that silence as creating a presumption in favor of liberty pending removal proceedings."  *Hernandez-Lara v. Lyons*, 10 F.4th 19, 26 (1st Cir. 2021) (citing *Matter of Patel*, 15 I. & N. Dec. 666, 666 (B.I.A. 1976) ("An alien generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security or that he is a poor bail risk.") (citations omitted)).

---

[3] The Court notes that 8 U.S.C. § 1225(b)(2)(A), a separate provision of the INA, provides for mandatory detention for "an alien who is an applicant for admission" to the United States.  The Fifth Circuit recently held that, as a matter of statutory interpretation, Section 1225(b)(2)(A) applies to all aliens present within the United States who have not been admitted by lawful means, regardless of when the alien entered the United States.  *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 498 (5th Cir. 2026).  Respondents have not argued here that Petitioners are subject to mandatory detention under Section 1225(b)(2)(A), and Petitioners have consistently been treated in their custody proceedings as candidates for discretionary release under Section 1226(a).

In 1996 Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which adopted the current version of the mandatory-detention requirements of Section 1226(c). *Id.* at 26–27 (citing Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996)). "The IIRIRA did not alter the discretionary regime of Section 1226(a) except by increasing the minimum bond amount from $500 to $1,500." *Id.* at 27. "Nevertheless, following the enactment of IIRIRA, the Immigration and Naturalization Service ("INS") adopted new regulations establishing a presumption of detention in the initial custody determination by the arresting officer." *See id.* (citing 8 C.F.R. § 236.1(c)(2)–(8)). "Under those regulations, a noncitizen seeking release bears the burden of 'demonstrat[ing] to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding.'" *Id.* (citing 8 C.F.R. § 236.1(c)(8)). "Although that regulation applied only to the custody determination by the arresting officer, the BIA soon adopted that standard for [S]ection 1226(a) bond hearings before an IJ, reversing its prior rule." *Id.* (citing *In re Adeniji*, 22 I. & N. Dec. 1102, 1112 (B.I.A. 1999); *In re Guerra*, 24 I.& N. Dec. 37, 38 (B.I.A. 2006)).

Accordingly, under current BIA precedent, a noncitizen detained under Section 1226(a) must demonstrate to the IJ "that he or she merits release on bond," *In re Guerra*, 24 I. & N. Dec. at 40, "even though [S]ection [1226(a)] does not explicitly contain such a requirement," *In re Adeniji*, 22 I. & N. Dec. at 1113. "To do so, the noncitizen must prove that he or she is neither a danger to the community nor a flight risk." *Hernandez-Lara*, 10 F.4th at 27 (citing *Matter of R-A-V-P-*, 27 I. & N. Dec. 803, 804 (B.I.A. 2020)). In contrast, the government "need not show anything to justify incarceration for the pendency of removal proceedings, no matter the length of those proceedings." *Velasco Lopez v. Decker*, 978 F.3d 842, 849 (2d Cir. 2020). In effect,

11

this has resulted in a presumption of detention for those subject to Section 1226(a) where none exists in the statute and none existed in practice at the time the statute was enacted. *See Huanga v. Decker*, 599 F. Supp. 3d 131, 146 (S.D.N.Y. 2022) (noting that at the time of enactment of Section 1226(a), the BIA's policy embraced the opposite—a "presumption against detention").

As noted, Section 1226(a) only governs detention during the pendency of removal proceedings. Once removal proceedings have concluded and an order of removal becomes final, detention becomes mandatory under Section 1231(a) for the 90-day statutory "removal period." 8 U.S.C. § 1231(a)(1), (2); *Zadvydas*, 533 U.S. at 682. The INA allows for detention beyond the removal period of those noncitizens who have been determined by the Attorney General to be "a risk to the community or unlikely to comply with the order of removal." 8 U.S.C. § 1231(a)(6). INS regulations impose the burden of proof on the noncitizen to make a showing to the contrary at custody determination hearings beyond the removal period. 8 C.F.R. § 241.4(d)(1).

Petitioners are not yet subject to a final removal order, as their appeal of the IJ's pretermitting of their asylum applications based on a finding that the applications were abandoned and therefore that they are subject to removal remains pending before the BIA. An order of removal becomes final at the earlier of two points: (1) a determination by the BIA affirming such order, or (2) the expiration of the period in which the noncitizen is permitted to petition the BIA for review of the order. *Riley v. Bondi*, 606 U.S. 259, 267 (2025) (citing 8 U.S.C. § 1101(a)(47)(B)). Under IIRIRA, Petitioners may thereafter seek direct appellate review of a final order of removal in the Fifth Circuit. *See Nasrallah v. Barr*, 590 U.S. 573, 579 (2020) (citing 8 U.S.C. § 1252(a)(1)). The removal period begins on the latest of the following: (i) the date the order of removal becomes administratively final (after BIA review); or (ii) if the

removal order is judicially reviewed and if a court orders a stay of removal, the date of the court's final order.  8 U.S.C. § 1231(a)(1)(B).

**B.      Supreme Court precedent does not foreclose Petitioners' claim.**

Petitioners argue that requiring them to bear the burden of proof at their recent custody redetermination hearing violates the procedural-due-process protections guaranteed by the Fifth Amendment.  Petitioners' reply brief makes clear that their constitutional challenge is not a facial challenge to the BIA's policy of imposing the burden of proof on detainees generally in the context of all Section 1226(a) discretionary bond hearings.  Rather, it is limited to an "as applied" challenge based on the specific facts of their case.  (Reply [#50], at 2.)  Respondents argue that Supreme Court precedent forecloses Petitioners' due-process challenge to the burden-of-proof allocation.  This argument is without merit.

Neither the Supreme Court nor the Fifth Circuit has addressed Petitioners' constitutional argument regarding the burden-of-proof allocation in the context of discretionary detention decisions.    However, the Supreme Court has issued several opinions regarding custody determinations in the immigration context that shed light on the parameters of due-process challenges that are foreclosed versus those that are allowed.

In *Jennings v. Rodriguez*, the Supreme Court held that Section 1226(a) and Section 1226(c) do not, as a matter of statutory interpretation, give immigrant detainees the right to periodic bond hearings during the course of their ongoing detention.  583 U.S. at 306.  In doing so, the Supreme Court rejected the argument that the text of Section 1226(c) (the mandatory-detention statute) "should be interpreted to include an implicit 6-month time limit on the length of mandatory detention."  *Id.* at 304.  The Supreme Court also found that the text of Section 1226(a), which says only that the Attorney General "may release" the alien "on . . . bond" does

13

not "even remotely" support a requirement for periodic bond hearings every six months at which the Attorney General bears the burden of proving by clear and convincing evidence that the alien's continued detention is necessary. *Id.* at 306. (As noted *supra*, detainees may, however, under the current administrative regime, request a subsequent bond redetermination in writing upon a "showing that the alien's circumstances have changed materially since the prior bond redetermination." 8 C.F.R. 1003.19(e)).

Here, Petitioners are not arguing they are entitled to periodic bond hearings due to the length of their detention. Nor are they raising a statutory argument. Their procedural-due-process claim is therefore not foreclosed by *Jennings*. The Supreme Court expressly left for another day the question presented by Petitioners: whether the Constitution entitles them to a bond hearing under Section 1226(a) at which the government, as opposed to the detainee, bears the burden of proof on dangerousness and flight risk. *See Jennings*, 583 U.S. at 312 ("Because the Court of Appeals erroneously concluded that periodic bond hearings are required under the immigration provisions at issue here, it had no occasion to consider respondents' constitutional arguments on their merits.").

Contrary to Respondents' arguments, the Supreme Court's decisions in *Demore*, *Flores*, or *Carlson* do not foreclose Petitioners' burden-allocation claim either. All three of these cases concerned constitutional challenges to mandatory or categorical detention schemes not at issue in this case. In *Demore*, the Supreme Court upheld the constitutionality of Section 1226(c) against a due-process challenge by a "criminal alien" arguing he was entitled to an individualized detention hearing despite his having been convicted beyond a reasonable doubt of a criminal offense triggering mandatory detention under the statute. *Demore v. Kim*, 538 U.S. 510, 529–31 (2003). In finding that the mandatory detention of a "criminal alien who has conceded that he is

14

deportable, for the limited period of his removal" did not run afoul of the requirements of the Due Process Clause, the Supreme Court relied heavily on evidence from various studies showing that more than 20 percent of "deportable criminal aliens" failed to appear for their removal hearings after being released on bond. *Id.* at 519.

Here, Petitioners have not been convicted of any of the crimes specified in Section 1226(c), are not a part of the population of "deportable criminal aliens" addressed in *Demore*, and are not subject to mandatory detention. *See Hernandez-Lara*, 10 F.4th at 36 ("Unlike section 1226(c), section 1226(a) applies to a wide swath of noncitizens, many of whom . . . have no criminal record at all."); *Velasco Lopez*, 978 F.3d at 854 (noting that "[u]nlike those mandatorily detained under § 1226(c), persons subject to detention under § 1226(a) . . . include individuals with no criminal record"). "Congress enacted § 1226(c) precisely because it wanted to ensure that the covered noncitizens would be detained pending their removal proceedings, absent the narrowest of circumstances," on the ground that they categorically present a heightened risk of danger to the community, or risk of flight, in contrast to the detainees under § 1226(a), "whom Congress permitted to be released on bond at the discretion of the Attorney General." *Black v. Almodovar*, 156 F.4th 171, 180–81 (2d Cir. 2025) (Nardini, J., dissenting from denial of rehearing en banc). *Demore* is not instructive or controlling.

Nor do the decisions in *Flores* and *Carlson* control. Those cases address facial challenges to unique mandatory detention schemes not at issue here either. In *Flores*, the Supreme Court rejected a facial constitutional challenge by "unaccompanied alien juveniles" detained under a regulation providing for their release only to their parents, close relatives, or legal guardians, except in "unusual and extraordinary" circumstances. *Reno v. Flores*, 507 U.S. 292, 295–96 (1993). The Supreme Court held that the procedures provided to the juveniles

passed constitutional muster because the juveniles were given the right to a hearing before an IJ; automatic review of the initial deportability and custody determinations was not required. *Id.* at 308–09.

*Carlson* addressed the "narrow question" of whether the INS could detain "active alien communists on warrants" without bond during removal proceedings under a government policy of categorically denying bond to noncitizens who were members of the Communist Party. *Carlson v. Landon*, 342 U.S. 527–28 (1952). As to the due-process challenge, the Supreme Court concluded that "[t]here is no denial of the due process of the Fifth Amendment under circumstances where there is reasonable apprehension of hurt from aliens charged with a philosophy of violence against this Government." *Id.* at 542.

The Government argues that because it may categorically detain a noncitizen without a bond hearing under Section 1226(c) (or other schemes), it follows that the individualized bond hearing provided to Petitioners under Section 1226(a) (and the availability of subsequent administrative review) necessarily satisfies due process, regardless of who bore the burden during the hearing. This argument attempts to extract too much from existing Supreme Court precedent. The thrust of *Demore*, *Flores*, and *Carlson*, read together, is simply that detention is a constitutional component of the removal process and certain categorical assessments of flight risk or dangerousness are constitutionally permissible. It requires no further explanation to illustrate that these cases do not govern the case at hand, which concerns procedures applied for evaluating whether noncitizens who are not subject to any categorical basis for mandatory detention should nonetheless be detained during their removal proceedings.

Moreover, the Supreme Court has determined that, despite its approval of certain mandatory detention schemes, there is an outer bound of what is constitutionally permissible

16

regarding detention, even of those already subject to a final order of removal. *See Zadvydas*, 533 U.S. at 680. Although Section 1231(a)(6) does not contain a statutory time limit on detention pending removal, the Supreme Court found that the Due Process Clause of the Constitution "limits an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States" (presumptively six months) and "does not permit indefinite detention." *Id.* at 689. Notably, the remedy the Supreme Court embraced to ensure due-process protections during prolonged detention before removal is a burden-shifting framework similar to what Petitioners argue is constitutionally required here. Per *Zadvydas*, once the detainee makes the threshold showing that there is "good reason to believe" removal is unlikely in the reasonably foreseeable future, the burden shifts to the Government to justify continued detention. *Id.* at 680. And this burden was found to be appropriate even where removability is already final, i.e., at a time when "the Government's interest [in continued detention] is presumably at its apex." *See Zheng v. Rokosky*, No. 26-CV-01689, 2026 WL 800203, at *8 (D.N.J. Mar. 23, 2026) (citing *Zadvydas*, 533 U.S. at 678).

Finally, it is worth noting that several circuit courts of appeals have addressed as-applied challenges to the burden-of-proof allocation in Section 1226(a) custody proceedings in recent years (and also did not find any jurisdictional or precedential impediments to addressing the merits of the issue). In *Hernandez-Lara*, the First Circuit held that the imposition of the burden of proof on the detainee to show dangerousness and flight risk violated her right to procedural due process where the bond decision was based on the Government introducing evidence that the detainee had been subject to an arrest warrant in El Salvador—evidence that the detainee disputed but struggled to rebut at the hearing. 10 F.4th at 23–25. In *Velasco Lopez*, the Second Circuit sustained an as-applied challenge to the burden-of-proof allocation by a detainee who

17

suffered adverse inferences at his bond hearing based on his inability to provide evidence regarding an earlier arrest and his criminal history.  978 F.3d at 847.

It is true that other circuits have rejected as-applied challenges to the burden-of-proof allocation in Section 1226(a) custody proceedings but did so based on the specific facts of the cases before them.  The Ninth Circuit, while rejecting the specific as-applied challenge at issue, expressly left open the possibility of other facts supporting a constitutional challenge to Section 1226(a)'s burden-of-proof framework.  *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022).  The decision in *Rodriguez Diaz* hinged on the fact that the detainee there (who had an extensive criminal history and was found to be a danger to the community) only based his constitutional challenge on the length of his detention during removal proceedings and failed to identify any specific prejudice he suffered at the custody hearing due to his bearing the burden of proof as to dangerousness.  *Id.* at 1212.  The Third Circuit issued a similar decision, finding that the duration of detention alone cannot sustain a due-process challenge by one who had been detained for 14 months absent a showing that there was a constitutional defect in the initial bond hearing.[4]  *Borbot v. Warden Hudson Cnty. Corr. Facility*, 906 F.3d 274, 277–79 (3d Cir. 2018).  And the Fourth Circuit rejected a procedural-due-process challenge based on the burden allocation in the context of a grant of a class-wide preliminary injunction by the district court.  *Miranda*, 34 F.4th at 366.  After finding that the district court lacked jurisdiction to issue the class-wide injunction, the circuit court addressed the due-process claim of a single petitioner and

---

[4] Notably, the Third Circuit has held that the Government is required to bear the burden of proof by clear and convincing evidence that a noncitizen is a danger or flight risk once detention has become unreasonably prolonged under Section 1226(c), relying on *Zadvydas*.  *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203 (3d Cir. 2020).  In *German Santos*, the petitioner had been detained for two and a half years and was still awaiting a final decision in his removal proceedings.  *Id.* at 208–09.

18

found that the district court had failed to apply the proper standards or to address whether different detention procedures would mitigate any risk of an erroneous custody determination. *Id.* at 363–64.

Although the Fifth Circuit has not addressed the issue, at least one district court in this Circuit has sustained an as-applied due-process challenge to the allocation of the burden of proof on the detainee in Section 1226(a) bond hearings. *See Ayobi v. Castro*, No. SA-19-CV-01311-OLG, 2020 WL 13411861, at *6 (W.D. Tex. Feb. 25, 2020). In *Ayobi*, the petitioner had spent more than 1,000 days in detention, much of which had been attributable to Government error in the underlying removal proceedings. *Id.*

**C.      Petitioners have been deprived of their right to procedural due process.**

Against this backdrop, we turn to the merits of Petitioners' argument that the allocation of the burden of proof at their custody redetermination hearings in December 2025 and January 2026 violated their right to procedural due process under the Fifth Amendment. In effect, Petitioners are arguing that requiring them to prove a negative—that they are *not* a danger to the community and *not* a flight risk—had the practical effect of imposing a presumption of detention where none exists in the statute. (And again, at the time of the enactment of Section 1226(a), the BIA's policy embraced a "presumption against detention." *Huanga*, 599 F. Supp. 3d at 146). Petitioners contend that due process demands that the burden be placed on the Government to justify the ongoing deprivation of their liberty interest during removal proceedings, in light of both the length of their prolonged detention ***and*** the repeated procedural maneuvers taken by the Government to prevent their release. As a remedy for this deprivation, Petitioners ask the Court either (1) to order a new bond hearing at which the Government bears the burden of proving they are a flight risk or a danger to community by clear and convincing evidence or (2) to order their

19

release with conditions sufficient to ensure they participate in future immigration proceedings. To prevail on their claim, Petitioners must demonstrate by a preponderance of the evidence that they are being detained unlawfully. *Delgado v. Noem*, 812 F. Supp. 3d 677, 679 (E.D. Tex. 2025).

It is well settled that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas*, 533 U.S. at 693; *see also Mathews v. Davis*, 426 U.S. 67, 77 (1976) ("Even one whose presence in this country is unlawful, involuntary, or transitory is entitled to that constitutional protection."). *See also Trump v. J. G. G.*, 604 U.S. 670, 673 (2025) (per curiam) ("[T]he Fifth Amendment entitles aliens to due process of law in the context of removal proceedings." (quotation omitted)).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted). "'Procedural due process rules are meant to protect' against 'the mistaken or unjustified deprivation of life, liberty, or property.'" *A. A. R. P. v. Trump*, 605 U.S. 91, 94 (2025) (quoting *Carey v. Piphus*, 435 U.S. 247, 259 (1978)). Due process "is flexible and calls for such procedural protection as the particular situation demands." *Mathews*, 424 U.S. at 334 (internal quotation omitted). To determine whether the application of a specific procedural framework in a given case violates due process and what procedures are in fact due, courts must consider and weigh the various private and public interests at stake. *See id.* at 334–35; *see also Nelson v. Colorado*, 581 U.S. 128, 135 (2017).

These factors, as identified by the Supreme Court in *Mathews v. Eldridge*, are (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."  424 U.S. at 335.  Courts have consistently applied the *Mathews v. Eldridge* three-part balancing test in evaluating due-process challenges to the allocation of the burden of proof in the context of immigration bond hearings, and this Court should do so here.  *See, e.g.*, *Hernandez-Lara*, 10 F.4th at 27–28; *Ayobi*, 2020 WL 13411861, at *5.

Analyzing the three *Mathews* factors given the facts of this case, the undersigned finds that Petitioners' private interest in their liberty is compelling; the Government's interest is comparatively slight; and the risk of error flowing from placing the burden on Petitioners to prove a negative is significant.  Thus, balancing the *Mathews* factors weighs in favor of Petitioners and finding that their due-process rights were violated.  Reaching this conclusion here, on these facts, does not mean that the Government must always bear the burden to justify ongoing detention in the context of Section 1226(a) bond determinations.  Again, Petitioners are not raising a facial challenge to the BIA's existing practice of imposing the burden of proof on detainees.  It is the specific circumstances of this case that require additional procedural protections to ensure Petitioners have been afforded the process they are due.

**Private Interest.**  The first factor, the private interest of Petitioners in their liberty, weighs heavily in their favor.  The Supreme Court has repeatedly recognized that "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint— lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690 (citing *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992)).  Moreover, the Supreme Court has

acknowledged that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protections." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Petitioners' liberty interest cannot be divorced from its context. The private interest in one's liberty and freedom is compelling for any individual immigrant held in detention, but here the interest is amplified because children are being detained. Petitioners are a family of six—a mother with five children, ages 18, 16, 9, and twin five-year-olds—and the deprivation of liberty they are experiencing is substantial. Although Petitioners do not base their procedural-due-process argument on the length of their detention alone, the fact that their detention has been prolonged and is now approaching one year increases the liberty interest at stake. At the time Petitioners filed their Amended Petition, they had been detained since June 4, 2025—for eight months. Petitioners now have been in detention for over ten months. As another district court in this District has recognized, "in the § 1226(a) detention context, the detainee's interest in receiving due process protections grows larger with every day in detention." *Ayobi*, 2020 WL 13411861, at *6. This is particularly true in the context of Petitioners' case—a case involving the detention of young children, for whom one year of detention amounts to a significant percentage of their lifetime. Each additional day a child is detained increases the risk of severe and lasting adverse effects on their psychological and physical development, even if a child is detained alongside a parent.[5]

---

[5] There are inevitably serious collateral consequences when the deprivation of liberty stretches to longer periods of time. According to Petitioners, Ms. El Gamal was recently denied medical attention for over six weeks regarding a mass on her chest, until finally on April 10, 2026, she experienced excruciating pain that resulted in her being taken to an off-site emergency room. (Notice [#57], at 1–2; El Gamal Decl. [#57-1], at ¶¶ 2–6.) The ER doctor performed a CT scan, which was inconclusive as to the lump but found trace pericardial effusion—fluid around her heart—and recommended an ultrasound, but the recommendation was denied. (Notice [#57], at 2–3; El Gamal Decl. [#57-1], at ¶ 7; ER Records [#57-2], at 2; Zeidan Decl. [#57-3], at ¶ 5.) There is concern Ms. El Gamal might have cancer or a systemic autoimmune disease requiring

Some courts have noted that because removal proceedings have a definitive end point, "the liberty interest of a noncitizen detained under section 1226(a) may therefore be slightly less weighty than that of individuals facing indefinite and prolonged detention." *Hernandez-Lara*, 10 F.4th at 29. But "only slightly less," as the "exact length of detention under section 1226(a) is impossible to predict" and here "significantly exceeds" the "very limited" period of detention analyzed by the Supreme Court at the time of its decision in *Demore* and others. *See id.* at 30 (quoting *Demore*, 538 U.S. at 530) (noting that, at the time *Demore* was decided in 2003, detention during removal proceedings only lasted "roughly a month and a half in the vast majority of cases" and "about five months in the minority of cases in which the [noncitizen] chooses to appeal"). At this point in time, the immigration system in this country is facing an unprecedented burden from the dramatic increase in immigration enforcement actions, and there is no indication that Petitioners' detention has any realistic end point in sight. Their removal proceedings are pending before the BIA on appeal and if resolved unfavorably will likely be appealed to the Fifth Circuit. According to attorneys representing other habeas detainees in this court, in 2020, it could take four to six months for the BIA to issue a decision after briefing was received. *See Ayobi*, 2020 WL 13411861, at *2 n.2. In light of the current immigration caseload, that estimate is now likely much greater. Without court intervention, Petitioners will be detained well over a year or even closer to two years by the time any removal order is final.

Importantly also, the length of Petitioners' detention is not solely or even predominantly of their own making. The Government has intervened in this case repeatedly and aggressively

---

urgent diagnosis and treatment. (Zeidan Decl. [#57-3], at ¶ 6; Reddy Decl. [#57-3], at ¶ 19.) These circumstances presumably resulted in the minor children remaining in the detention center without a parent or other adult family member while Ms. El Gamal received emergency treatment. (Their 18-year old sister, Ms. Soliman, had been separated from them months ago, allegedly due to her speaking to the press regarding conditions at Dilley.) (Am. Pet. [#42], at ¶ 66.)

23

from its inception (addressed *infra*), which has significantly contributed to the reality of Petitioners' prolonged detention. Although Petitioners arguably have contributed in some part to the length of their detention by filing an appeal with the BIA in their underlying removal proceedings, courts have recognized that detainees should not be penalized for pursuing available legal relief or defending against removal in evaluating their private interests in their liberty. *See German Santos*, 965 F.3d at 211.

In sum, Ms. El Gamal and especially her children have a compelling interest in being released from government custody—"the most significant liberty interest there is." *Velasco Lopez*, 978 F.3d at 851. "Case after case instructs us that in this country liberty is the norm and detention is the carefully limited exception." *Id.* (quotation omitted).

**Government Interest.** The next factor, the Government's interest in detaining Petitioners, is comparatively slight. Respondents assert that their interests are compelling interests in ensuring the prevention of Petitioners' flight and their participation at removal proceedings. These are of course legitimate government interests in theory but as applied to this case are diminished significantly. As the Supreme Court explained in *Zadvydas*, this case is not about a choice between "imprisonment and [Petitioners] 'living at large' in this country" but "between imprisonment and supervision under release conditions that may not be violated" and that in and of themselves can significantly mitigate any risk of flight. 533 U.S. at 696. In fact, when the District Court ordered Petitioners released in its TRO Order, release was conditioned upon Ms. El Gamal wearing a GPS-enabled ankle monitor during her release and posting a $15,000 bond. (TRO Order [#15], at 11.) Petitioners have now offered to have each one of Ms. El Gamal's children also fitted with ankle monitors and to report for *daily* ICE check-ins if necessary to address Respondents' concerns regarding flight risk. (Notice [#57], at 6.)

24

Ultimately, any detention must bear a "reasonable relation" to its purpose. *Zadvydas*, 533 U.S. at 690 (quotation omitted). The Government has not articulated a compelling interest in the prolonged almost year-long detention of a mother and her five children despite there being conditions available to mitigate risk of flight and to ensure their appearance at future removal proceedings. Nor does the Government acknowledge the significant collateral societal costs caused by detention—both on taxpayers who shoulder the financial burden and on the detainees, particularly the children. Shifting the burden of proof to the Government to prove Petitioners are in fact a flight risk imposes no additional fiscal or administrative costs on the Government. It merely changes how the IJ must weigh the evidence presented.

**Risk of Erroneous Deprivation.** The final factor, the risk of erroneous deprivation of liberty, also weighs in favor of finding Petitioners were entitled to more procedural protections than they received to ensure due process. In evaluating this factor, the Court considers how the procedural allocation of the burden of proof on Petitioners to prove a negative—that they are not a flight risk—magnifies the likelihood that the IJ made an erroneous decision regarding Petitioners' eligibility for discretionary bond. There are undeniably numerous structural realities implicit in the immigration system generally that already place a thumb on the scale in the Government's favor. Courts have noted that detainees often lack counsel, face difficulty obtaining evidence on their behalf while in detention, face language barriers, and already suffer from the imbalance of power in a system in which the Government (due to its knowledge regarding procedures and preferences) already has the upper hand. *See Hernandez-Lara*, 10 F.4th at 30–32 (finding risk of error to be "inherent in the current burden allocation" in Section 1226(a) custody proceedings).

In this specific case, Respondents argue the risk of erroneous deprivation of liberty nonetheless is low because Petitioners received a bond hearing, were represented by counsel at that bond hearing, and had the opportunity to file but did not file an appeal. Yet the availability of those protections "do little to reduce the risk of error caused by the regulations' burden allocation," as at all levels of review the burden remains on the detainee, whether counsel is present or not. *See id.* at 32 ("Loaded dice rolled three times are still loaded dice."). And here, it appears that the dice were loaded from the beginning.

The record establishes that the Government has engaged in procedural maneuvers aimed at thwarting the possibility of Petitioners' discretionary release from the moment they were taken into custody. It is unquestionable that Petitioners have been targeted by the Government due to their connection to an individual allegedly responsible for a terrorist act despite the fact that there has never been any evidentiary finding that Petitioners themselves were affiliated with that act or even had knowledge of its occurrence. The very same day Petitioners were taken into custody in connection with Mr. Soliman's alleged terrorist activity, President Trump posted on social media that Petitioners "COULD BE DEPORTED AS EARLY AS TONIGHT."[6] Thirty minutes later, he again posted: "Six One-Way Tickets for Mohamed's Wife and Five Kids. Final Boarding Call Coming Soon."[7] Immediate deportation is, of course, impossible under federal law, and the posts reflect both disregard for the due-process protections Petitioners are guaranteed and the targeting of Petitioners for potentially punitive and political purposes.

---

[6] *See* @WhiteHouse, X (June 3, 2025, 3:12 p.m. CT), https://x.com/WhiteHouse/status/1929994561398681868.

[7] *See* @WhiteHouse, X (June 3, 2025, 3:42 p.m. CT), https://x.com/WhiteHouse/status/1930002225860133080?t=ryvUEn5J2xTnSisLHpmgLw&s=09.

When the IJ assigned to evaluate Petitioners' eligibility for bond found that they were not subject to mandatory detention under Section 1226(c), were not a danger to the community, were not a flight risk, and ordered release, the Government acted swiftly to invoke an automatic stay of the IJ's bond decision, despite numerous courts across the country finding that the automatic-stay provision, 8 U.S.C. § 1003.19(i)(2), is unconstitutional. After Petitioners sought judicial review in this Court, the District Court granted them a TRO because the Court agreed with Petitioners that they were likely to succeed on the merits of their constitutional challenge to the automatic-stay provision, and Petitioners were again ordered released. The Government again intervened to find another justification for Petitioners' detention by seeking a discretionary stay under 8 C.F.R. § 1003.19(i)(l) to moot their constitutional challenge.

Equally as concerning is the fact that the very same IJ who originally found Petitioners *not* to be a flight risk subsequently reversed his decision on a nearly identical record of evidence on the flight-risk factors. At the first bond hearing, the IJ stated as follows:

> The respondents have a fixed address in the United States; they have been in the United States since 2022 and have demonstrated diligent efforts in seeking affirmative relief; they have no criminal history and they have continued to cooperate with law enforcement. Although they do not have significant family ties in the United States, there is a showing of significant community support for the respondents. The Court does not ignore that certain factors do increase the risk of flight, to include their immigration violation of overstaying their visa, the speculative nature of asylum claims generally, and lack of significant family ties in the United States. However, these factors do not establish that the respondents pose such a flight risk that no bond amount would ensure their appearance at future hearings.

(IJ Bond Decision [#42-1], at 5–6.) At the subsequent bond hearings, the same IJ characterized the same evidence differently, finding Ms. Gamal (and her children) to pose "a significant flight risk" and that "no bond amount would ensure [their] appearance at future hearings" due to Ms. Gamal's "lack of property and assets in the United States, lack of family ties in the United States,

27

[and] the length of time in the United States (since August 2022)." (IJ Bond Decision [#42-3], at 3.)  This was ostensibly due in part to the fact, cited by the IJ, that "an immigration judge ha[d] denied [Ms. El Gamal's] application for asylum and withholding protection." (*Id.*)  But there is some evidence before the Court that suggests the Government improperly interfered in the subsequent custody hearings, too.  And the Government has not pointed the Court to any specific portion of the custody redetermination hearings illustrating the fairness of those proceedings, only that they occurred and that Petitioners were counseled.[8]

According to Petitioners, Respondents vigorously argued at those proceedings that Petitioners pose a flight risk because they lack family and community ties in the United States.  Yet according to a declaration by Ms. El Gamal, she recently discovered that her sole U.S. citizen relative has been reticent to step forward to provide support for her and her children because he has been targeted for detention and subject to intimidation and interrogation by DHS about his willingness to help Ms. El Gamal and her children.  (El Gamal Decl. [#54-1], at ¶¶ 4–5.)  At the custody redetermination hearing, counsel for DHS argued that because the relative had "not made an effort to provide a letter of support" for the family, the lack of family support contributed to their risk of flight.[9]  The IJ relied in part on the "lack of family ties in the United States" in denying bond.  Although the evidence of the Government's treatment of Ms. El Gamal's cousin concerns recent events, in the context of all that has transpired in this case, there

---

[8] The Government provided the Court with the audio files from the three days of custody redetermination hearings with their response to the Amended Petition.  The audio files comprise nine hours of hearings.  The Government did not cite to any particular portion of the hearings in making its arguments before the Court and has not articulated how the recordings answer the due-process concerns articulated by Petitioners addressed in this Report and Recommendation.

[9] Petitioners provided the Court with the time stamp for these statements, which can be heard at the 1 hour 54 minute mark of the audio recording of the January 21, 2026 hearing.

is reason to believe the cousin may have been similarly dissuaded earlier, and Ms. El Gamal credibly avers in her declaration that she could have had his support, and that his support could have influenced the evaluation of flight risk, but for governmental interference.  (*Id.* at ¶ 6.) Beyond her family, Ms. El Gamal has heard from the wife of one of the prominent leaders in her Muslim community in Colorado Springs that "immigration officials are bothering everyone who is trying to help you. . . . Everyone is afraid."  (*Id.* at ¶ 7.)   DHS argued at the bond redetermination hearing that Petitioners had no real community support and there were no letters of support in the record from anyone from their religious community or the mosque where they worship.[10]

True, detainees generally possess knowledge of the most relevant factors bearing on the risk of flight, "such as their family and community ties, place of residence, length of time in the United States, and record of employment."  *Hernandez-Lara*, 10 F.4th at 40.  And one might argue this is a reason to impose the burden of proof on Petitioners in proving they are not a flight risk.   Petitioners argue in their Amended Petition that they "submitted copious evidence" regarding their lack of danger and lack of flight risk to the IJ at their original bond hearing, such as letters of support from U.S. citizen friends and family members showing the extensive community ties they built in their home community of Colorado Springs, and specific evidence from a community sponsor regarding housing.  And that evidence was originally persuasive as it resulted in a favorable bond determination by the IJ at the first bond hearing.  Yet despite the IJ's finding of a *lack* of danger or risk of flight, since that time and at every subsequent step of this case, the Government has relentlessly sought to detain Petitioners through targeted procedural maneuvers and the intimidation of Petitioners' family and community.   Given these

---

[10] *Id.*

circumstances, which suggest a heightened risk of error, also requiring Petitioners to bear the burden of proving they were not a risk of flight, i.e., requiring Petitioners to rebut a presumption of detention, created a substantial risk of an erroneous deprivation of their liberty.

The allocation of the burden of proof on Petitioners also caused them actual prejudice. *See Hernandez-Lara*, 10 F.4th at 41 ("[W]hen faced with a constitutional due process claim in the immigration context, we ask whether the procedure at issue is likely to have affected the outcome of the proceedings as a condition of relief.") (quotation omitted); *Calderon-Ontiveros v. I.N.S.*, 809 F.2d 1050, 1052 (5th Cir. 1986) ("[P]rocedural due process is violated only if the government's actions substantially prejudice the complaining party.")   A burden-of-proof allocation dictates how the IJ ultimately weighs the evidence; where evidence arguably cuts both ways regarding the possibility of flight, as here, the burden of proof dictates the outcome and breaks the equilibrium.  At the first bond hearing, even with the burden of proof on Petitioners, the IJ concluded Petitioners did not pose a risk of flight that could not be adequately mitigated with conditions, like an ankle monitor.  But with only a small shift in circumstances between that hearing and the second one (where Petitioners also bore the burden), the IJ came out the other way.  This is precisely the type of situation where the allocation of the burden of proof could make a difference in outcome.

In light of Petitioners' prolonged detention and the Government's aggressive tactics in this case, requiring the Government to bear the burden of proof to affirmatively prove Petitioners are either a danger to the community or a flight risk would significantly mitigate the risk of erroneous deprivation of Petitioners' commanding liberty interest.  *See Lopez-Arevelo v. Ripa*, 801 F. Supp. 3d 668, 688 (W.D. Tex. 2025) ("Allocating the burden in this manner reflects the concern that '[b]ecause the alien's potential loss of liberty is so severe . . . he should not have to

share the risk of error equally.'") (quoting *German Santos*, 965 F.3d at 214).  As already noted, the shifting of the burden of proof in the context of bond decisions has been repeatedly endorsed as a constitutionally valid means of mitigating the risk of erroneous deprivation and ensuring procedural due process.  Even where detainees are subject to mandatory detention under Section 1226(c) or Section 1231(a) due to categorical reasons for their detention, courts have recognized that, at times, the Government must bear some responsibility for justifying the ongoing deprivation of liberty where detention has become unreasonably prolonged or there are other factors calling into question the integrity of bond proceedings.  *See e.g.*, *Zadvydas*, 533 U.S. at 680; *German Santos*, 965 F.3d at 208–09.

In sum, Petitioners have demonstrated by the preponderance of the evidence that the balance of *Mathews* factors weigh significantly in their favor and that they have suffered actual prejudice as a result of the violation of their right to procedural due process due to their bearing the burden of proof at their custody redetermination hearing.

**D.     The remedy for the constitutional violation is release—not a third bond hearing.**

Petitioners ask for either a new bond hearing at which the Government bears the burden to prove dangerousness or flight risk or that they be released under conditions sufficient to ensure their participation at future immigration proceedings.  While ordering a new bond hearing may be an appropriate remedy in some cases, in light of the significant risks that the Government will intervene to again target Petitioners' case and to prevent their lawful release, a third bond hearing would be an inadequate remedy to ensure due process is preserved.  Petitioners have already been detained for over ten months.  Requiring them to endure further detention and the inevitable delay in the provision of another bond hearing risks compounding the constitutional violation.  Immediate release is the appropriate remedy.  That said, any future attempt to re-

detain Petitions under Section 1226(a) must comport with due process and must involve an individualized bond hearing at which the Government must justify re-detention.

## IV.  Conclusion and Recommendation

Based on the foregoing, the undersigned **recommends** that the Amended Petition for Writ of Habeas Corpus filed by Petitioner Hayam El Gamal and her five children [#43] be **GRANTED** and that Respondents be ordered to **RELEASE** Petitioners from their custody under conditions sufficient to ensure their participation at future removal proceedings.

**IT IS THEREFORE ORDERED** that the parties confer on conditions of release and submit joint proposed conditions for Petitioners' post-removal supervision that comply with the relevant statutory provisions and regulations within **fourteen days** to be considered by the District Court.

## V.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party

from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

SIGNED this 20th day of April, 2026.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE